JUAN RIVERA v. THE STATE.

No. 11186.   Delivered June 13, 1928.

*A. B. Galbraith* of Brownsville for appellant.

*A. A. Dawson* of Canton, State's Attorney, for the State.

HAWKINS, JUDGE.—The offense is murder; punishment fixed at confinement in the penitentiary for a period of five years.

(1) Appellant's brother, Guadalupe Rivera, shot and killed Henley Williams, it being claimed by the state that appellant was guilty as a principal. Some time before his death, Williams had shot and killed one Madraza. On his trial he defended upon the ground that the relations of Madraza with the wife of Williams were unduly intimate. As a result of the trial Williams was convicted of manslaughter with a suspended sentence. His wife did not admit the relations with Madraza and did not testify upon the

trial of Williams but instituted suit for a divorce. After killing Madraza, Williams resided at a hotel while his wife and two children remained at the family home in Brownsville. After the verdict, Williams sought to live with his wife, which she opposed, and obtained an injunction restraining him from taking their children out of the county. The injunction was not served though Williams became aware of its existence. The children, it seems, were taken to Gilmer, Texas, but were brought back to their home a short time before the tragedy occurred. Fearing violence from Williams, Mrs. Williams, with the aid of her attorney, employed appellant and his brother to guard her home. Williams came to the home in an automobile and received two pistol wounds at the hands of Guadalupe Rivera, who claimed that he acted in self-defense. In his dying declaration Williams stated that he offered or used no violence, but simply endeavored to enter his home, when he was fired upon by appellant's brother. A brief synopsis of the facts will be found in the case of Ex parte Rivera, 285 S. W. Rep. 327, in which appellant's brother by habeas corpus sought bond in regard to this transaction. A detailed statement of the evidence is not deemed expedient owing to the voluminous record, nor is it regarded as necessary to illustrate the issues and the questions of law involved in this appeal.

(2) The deceased made a dying declaration in the presence of the witnesses A. S. Lanier, J. C. George and Josephine Vaughan. Lanier reduced the statement to writing and signed it for deceased in the presence of the witnesses George and Vaughan. The written statement was introduced in evidence and reads as follows:

"Friday morning I drove from Dallas to Trinton in my car to T. C. Scales house thinking my wife had taken the children there. He told me my children was not there nor had been there. I then told him I was coming to Brownsville to see if my children was here. He said he was leaving Trinton for Brownsville Saturday morning by train. I was driving by auto. He evidently got in here about 8:45 this morning. I reached here about 4:30 this afternoon. Mr. Scales my father in law, was sitting on the front porch of Mr. Rosenthals house when I drove up. Someone inside my house closed the front door putting the night latch on. I then went around to the rear and someone was closing the three back doors, the back screen was already fastened, and I tried to break it open. About that time 2 Mexican men, who were concealed in my orchard, jumped the fence and came up to me. One of them shot me in the stomach. I assumed he thought I was a burglar trying to break into my own

house. I said 'Man, what are you doing, I am trying to break into my own house.' He said nothing but shot me again. No one knew that I was coming to Brownsville except my wife and Mr. Scales. My wife did not know that I was coming to Brownsville unless Mr. Scales told her."

The witness George testified that he had another conversation with the deceased in which the latter said:

"I am done for. I am all in. I am killed, or they got me. * * * I want to see my children before I die."

Deceased then told witness he had taken his children from Brownsville to Gilmer; that he had left for the day and when he returned they were gone; that he went to Trenton, the home of his father-in-law Scales and inquired for his children. Failing to find them, he went to Brownsville; that as he approached his home, he saw Mr. Scales on the front porch of the house across the street; that he drove into the yard and some one closed the door, and as he was trying to open the screen door, two Mexicans came up; that as they approached him he turned toward them and one of them shot him in the stomach; that he fell on his back and threw up his hands and said, "Man, why are you shooting me? This is my house;" that the Mexican then shot him again. The deceased said he had no arms.

(3) Bill number two reflects complaint that the witness George, after signing the written statement as a witness, was permitted to give his recollection of the declaration of deceased, and bill number five relates to the testimony of the same witness, being a specific complaint of the receipt in evidence of the declaration imputed to the deceased that he wanted to see his children before he died. It is to be noted that the written declaration introduced contains no statement that the deceased was conscious of impending death. The declaration imputed to deceased by the witness George that he wanted to see his children before he died seems to have been appropriate as a predicate for the receipt in evidence of the dying declaration.

(4) Bills numbers seven and eighteen relate to the refusal to receive the testimony of the witness Scales relative to some conversations with the wife of the deceased, who was a daughter of the witness, in which she related to him that she had called upon the sheriff of Cameron County and told him she was in danger from her husband; that she feared that he would do harm to herself and the children and that she asked the sheriff for protection; that the sheriff replied by telling her that he would serve the injunction papers; that upon the refusal of the sheriff to extend her protection,

she went to a lawyer, and through him secured appellant and his brother to protect her and the children. Robertson, the sheriff, testified that he was called over the telephone by Mrs. Williams and asked if he had served the injunction. When informed that Williams had not been served, she told the sheriff that her husband was coming home and should be served; that the sheriff replied that he would serve the papers. He said further: '

"Relative to her fears, she told me she wanted me to come out to her home and I refused to come. I told her I would see her in the office, but don't recall she mentioned any fears. I told her I would talk to her if she would come to the office. * * * She did not state to me that she wanted me to place a guard at her home."

It is appellant's position that in view of the contradiction between the witness and the sheriff, the hearsay statement to her father was admissible as corroborating or supporting testimony. This is not believed sound.

(5) Bill number seven preserves complaint of the refusal to receive in evidence a part of the testimony of Mrs. Z. A. Rosenthal given upon the examining trial. The recitals in the bill are too meager to give any information touching the setting. If we comprehend it, however, appellant introduced a part of the testimony of Mrs. Rosenthal given upon the examining trial, but the part introduced is not shown by the bill; that he desired to introduce additional testimony to show that she had heard that Williams had killed Madraza and from his general reputation she feared him; that she had heard that he shot Madraza in the back. The bill shows no error.

(6) In the charge of the court are found the usual definitions, also a charge on the law of principals. There is embraced the defensive theory that Mrs. Williams had the right to employ appellant and his brother to protect her property, also the lives of herself and her children, and to do, by or through appellant and his brother all things that she might do herself. Further, that deceased having notice of the injunction, was a trespasser, and that there might be used against him, by any of the parties, such force as reasonably appeared to them at the time to be necessary to compel the deceased to leave the premises, and that if no more force was used than appeared necessary, an acquittal should result. Following the foregoing instruction there is found in the same paragraph of the charge this language.

"On the other hand, if you should find and believe from the evidence beyond a reasonable doubt that the said Guadalupe Rivera used more force than was necessary to accomplish such purpose, then in this connection you should find the said defendant guilty and so say by your verdict, unless you have found the defendant not guilty under some other paragraph of this charge."

The jury was also told that Mrs. Williams had the legal right to defend her home, as well as her children, and a homicide committed in defense of the home against an attack with violence was justified, and that if the defendant reasonably believed that such attack was due to result in serious bodily harm to Mrs. Williams or her children, or any of the people then in the home, the right should be applied to the facts in this case as viewed from the standpoint of the defendant at the time of the attack; that the right should be viewed in the light of the respective strength, not only of the appellant and his brother, but also of the women and children who were inmates of the home and the danger to them, as viewed from the standpoint of the appellant at the time. The court instructed upon the law of threats as applied to all of the inmates of the house, instructing that this application should be viewed from the standpoint of Guadalupe Rivera; that the right of perfect self-defense was accorded to defend against real or apparent danger to either Guadalupe Rivera or Mrs. Williams, or her children, and the danger should be viewed from the standpoint of Guadalupe Rivera, taking into account his knowledge of the character and disposition of the deceased, and all facts and circumstances in evidence must be viewed from the standpoint of the defendant.

An exception addressed to the charge was in substance that it was misleading in combining the instruction on the right to protect the home and the right to defend against an attack, real or apparent, and was calculated to lead the jury to the conclusion that in the latter case, as well as in the former, the law of excessive force was to be applied. An examination of the instructions leads us to believe the exception is without merit. As worded in the charge there is no such combining of instructions relative to protection of the home and of the persons as would confuse the jury on the question of excessive force.

(7) A most serious question is raised upon the following charge to the jury.

"You are further instructed that you will not consider any testimony of the witness Mrs. Williams given on the witness stand which

in any manner tends to prove or show whether the said witness Mrs. Williams or her dead husband Henley Williams were right or wrong in the differences between them."

Appellant in a timely and proper manner excepted to the foregoing instruction on the ground that it withdrew from the jury's consideration evidence which was highly important and favorable to appellant. Mrs. Williams' testimony covered thirty three pages of the statement of facts, from page 64 to 97, the entire testimony being almost exclusively devoted to a history of the differences between her and deceased. The charge complained of does not undertake to designate or withdraw any particular evidence given by her but embraces all evidence which in any manner tended to prove or show which was right or wrong in the difference between them, thus leaving the jury to determine what testimony given by Mrs. Williams came within the court's exclusion. It is impracticable to set out in detail her evidence but it may be condensed substantially as follows: (Page 64): she says deceased threatened her with violence if she sued for divorce; that he accused her of illicit relations with one Madraza whom he later killed; that she thought she had convinced deceased he was wrong and that he was reconciled; that at first deceased was going to kill her, the man, his children or himself, but she talked to him and believed his mind deranged; (page 65) appears testimony that for two years she had lived under fear of death or violence due to the actions and threats of her husband all arising from their differences; (page 66) that he tried three times one night to shoot her with a rifle because she had gone to play bridge at Judge Graham's; that he locked her out of the house and cursed her; (page 67) that he again threatened to kill her when she prepared to take the children to Trenton, Texas; (page 68) she tells about deceased shooting young Madraza which grew out of family differences, he having charged her with being intimate with Madraza; (page 70) that deceased could not live with her and could not live without her and that if she asked for a divorce he would end the whole thing; (page 71) she tells of the effort to adjust the differences at the time her husband was tried for killing Madraza and of her intention to put those differences in the divorce court, and of efforts to get her to testify to illicit relations with Madraza; (page 72) she tells about her father coming down from Trenton and she and her father making various propositions to deceased; (page 73) she tells in detail about her offer to submit their family differences to the divorce court and of his refusal to permit that to

be done; of sleeping behind locked doors; and of guarding the children until deceased would leave in the morning; (page 75) she relates the circumstances of his decision to take the children from her, and of her search for the children; (page 77) she tells of recovering the children and calling on the sheriff for protection against her husband; (page 78) she tells about going to her attorney and arranging for her protection against her husband's threatened visit; (page 79) she tells of her fear that if deceased did come he would "make an end of the whole thing;" she tells about hiring appellant and his brother and preparing for the defense of her home, her children and herself. Mrs. Williams testified that she apprised appellant and his brother of all the matters detailed by her relating to the family trouble, and apprised them of his threats and of her fears. We here again call attention to the substance of the defensive instructions set out in paragraph six of this opinion. Under this and other instructions given the right of appellant and his brother were the same as Mrs. Williams herself had in the premises, and they all arose from the family differences existing between her and deceased. Appellant and his brother received their information from her, and embraced necessarily her viewpoint that she was right in her attitude and that deceased was wrong. Yet, the court in the instruction complained of withdrew from the jury's consideration all of her testimony which in any manner tended to show whether she or deceased was right or wrong, leaving it to the jury to determine what of her evidence was or was not relevant under the instructions given. The testimony withdrawn was as to the very facts which had been communicated to appellant and his brother by Mrs. Williams and upon which from their standpoint their right in large part to act depended. A large part of the evidence of Mrs. Williams to which we have referred as well as other portions did unquestionably bear upon the point as to whether she or her husband was right or wrong in the differences between them, but the evidence bore upon the vital issues involved in the present case as well. We can reach no other conclusion but that in the sweeping withdrawal of the testimony of Mrs. Willams the court was in error. Its effect upon the jury could have resulted only in harm to appellant. Appellant also excepted to the court's instruction withdrawing all testimony of Mrs. Williams in regard to her conversation with J. C. George, or any statement made by said witness in reference to George. In his brief appellant refers us to the testimony of Mrs. Williams as found upon pages 73 and 74 of the statement of facts. We doubt if the withdrawal of

the testimony so designated would justify a reversal. However, the record is voluminous and there may be other evidence of Mrs. Williams relative to George overlooked by us which would fall within the principle discussed in paragraph seven of our opinion. If so, what is there said will sufficiently indicate our views for the guidance of the court upon another trial.

Bills four, eight, ten, twelve, fifteen, sixteen, seventeen and nineteen are not discussed at length. They have not been overlooked. They are not thought to present error upon which a reversal could properly be predicated.

Because of the error discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*